IN THE UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID WEEKS, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. 1:22-cv-10996 |
| ) | |
| RAYTHEON TECHNOLOGIES ) | |
| CORPORATION, ) | |
| ) | |
| Defendant. ) | |

## COMPLAINT FOR DAMAGES AND TO COMPEL ARBITRATION

NOW COMES David Weeks by and through his attorneys, Lynn, Lynn, Blackman & Manitsky, P.C, and complains as follows:

1. David Weeks is a resident of Vermont and resides at 35 Warner Avenue, Proctor, VT 05765.

2. Raytheon Technologies Corporation (Raytheon) is a Massachusetts corporation with its headquarters located at 870 Winter Street, Waltham, Massachusetts 02451.

3. Jurisdiction exists in the federal district court as there is a diversity of citizenship and the damages exceed $75,000.

4. David Weeks served for 31 years as a Marine and as a Naval Officer in the United States military including Iraq operations.

5. After leaving military service, Mr. Weeks entered private industry. He worked for private defense contractors.

6. In 2011, he was hired by Raytheon to work in Riyadh to lead the delivery, training and maintenance of airborne intelligence systems to the government of Saudi Arabia. He spent two years leading that project.

7. In 2013, transferred within Raytheon to Jeddah to lead the in-country complete modernization, training, and sustainment of all Patriot air defense missile and radar systems to the government of Saudi Arabia. He spent two years leading that project.

8. In 2015, Raytheon transferred Mr. Weeks to a similar in country leadership position in Seoul. Mr. Weeks was responsible for leading modernization of all Korean Patriot air defense systems and missiles. He performed that work for approximately three years. Again, the quality of this regionally sensitive project was exemplary.

9. In 2018, Mr. Weeks was selected to be the senior representative as the Vice President of NATO programs for Raytheon at Thales-Raytheon Systems (TRS), a joint venture in Paris. The joint venture developed and deployed air missile defense command/control systems for all NATO countries. Mr. Weeks' work performance was considered by Raytheon and TRS to be outstanding until the time of his separation from employment in 2021.

10. While Mr. Weeks worked for TRS. He was paid pursuant to a contract of employment initially signed with Raytheon.

11. During the final two years of this three year assignment with TRS, Europe and the United States experienced the COVID-19 pandemic. As part of the reaction to COVID, all governments imposed restrictions on travel. In particular, the United States and European Union governments restricted travel crossing borders unless the travel was for essential work. To establish that work was essential, employers were required to provide written certification to the authorities.

12. At TRS, there was clear protocol for the issuance of such letters as a matter of administrative routine. It was expected that when a TRS employee was required to travel to any country outside of France, including the United States, that the TRS Leadership team would

generate a letter supporting the essential nature of the travel.  Given the frequently classified nature and strategic importance of the work being done by the TRS employees, it was not difficult to support essential business related travel.

13. Mr. Weeks was aware during his time at TRS that it was acceptable to generate an essential work travel letter when a Raytheon employee working within TRS was departing France at the end of their overseas assignment.  The TRS leadership team handled this administrative requirement on behalf of the parent companies, Thales and Raytheon.  There was never any limitation communicated by Raytheon to Mr. Weeks regarding those letters, other than the implied understanding that the travel was essential to the performance of the TRS project and that the substance of the letter be accurate.

14. In November 2020, Mr. Weeks was asked to draft an essential work travel letter for a Canadian citizen, Kenneth Nesbitt, who worked for Raytheon at TRS.  Mr. Nesbitt's Raytheon overseas contract and French visa were expiring in December 2020, and he expected to return to the United States to consult with Raytheon on his future assignment with the company.

15. It was Mr. Weeks' understanding that no final decision had been made as to the reassignment or continued employment of Mr. Nesbitt and that Mr. Nesbitt would be consulting on that and other issues with Raytheon upon his return to the United States.  Just as importantly, nobody ever communicated to Mr. Weeks that it would be unethical or improper to support Mr. Nesbitt's return to the United States to confer with Raytheon's officers.

16. On November 28, 2021, Mr. Weeks issued the Letter to Mr. Nesbitt (the Letter).  Mr. Weeks did not have a close personal friendship with Mr. Nesbitt.  Nor did Mr. Weeks have any financial incentive to support Mr. Nesbitt's travel to the United States.  His only intention was to support what he thought was administratively expected as Mr. Nesbitt's team leader.

17. Mr. Nesbit and his American wife traveled on time to their home in the United States as Raytheon directed. Once in the United States Mr. Nesbitt began the process of determining his next Raytheon assignment. The travel letter was intended to be used only for his departure from France and to enter the United States.

18. The Letter was completely accurate in describing Mr. Nesbitt's employment position, the purpose of his travel and all other material aspects of the matters described therein. There are no material misrepresentations in the Letter.

19. Long after the Letter was issued, in the summer of 2021, Raytheon notified Mr. Weeks that it had opened an investigation of Mr. Nesbitt's allegedly unethical conduct in possessing the Letter. Mr. Weeks was never apprised of any collateral allegations against him and, therefore, could not gather all of the important evidence to rebut the baseless allegations of wrongdoing although it is known that nearly identical COVID-19 Essential Travel letters exist as examples of this routine administrative procedure with the TRS CEO's and Mr. Weeks' signature.

20. During a conference call between Mr. Weeks and his Raytheon supervisor on August 24, 2021, it was communicated that during Mr. Nesbitt's ethics investigation it was suggested that Mr. Weeks issued the Letter with the intent of supporting Mr. Nesbitt in obtaining a US work visa. During this call, Mr. Weeks was terminated effective immediately. The Raytheon supervisor's statements were false and the persons making those allegations knew them to be false.

21. In fact, there was nothing improper about the letter issued to Mr. Nesbitt. Raytheon knew that was the case. However, it also wished to avoid paying Mr. Weeks significant benefits in the event of his termination from employment following the end of his French Raytheon assignment.

22. Mr. Weeks had two employment contracts with Raytheon, one governing his assignment to TRS (Work Assignment Agreement) and one describing most compensation and benefits due to him in connection with that work (Retention Agreement). The Work Assignment Agreement indicated that the term of his employment was until September 7, 2021. The Retention Agreement identified a bonus to be paid to Mr. Weeks upon completion of his assignment.

23. The Retention Agreement requires arbitration of any disputes and application of Massachusetts law. The Work Assignment Agreement requires the application of Massachusetts law and that the venue for any litigated disputes be in Massachusetts. Both contracts should be considered together as part of Mr. Weeks compensation plan, and, therefore, all matters raised herein should be considered in arbitration.

24. The employment contracts with Raytheon state that Mr. Weeks is entitled to certain substantial bonuses, wage payments and other benefits at the conclusion of his work assignment at TRS. The contracts also indicate that if he were terminated for reasons other than misconduct or unsatisfactory performance (i.e. without just cause), he would be treated as having completed his Raytheon assignment, earning the above-described compensation and benefits, none of which were paid.

25. Specifically, Mr. Weeks is entitled to contractually guaranteed severance payments, payment of his retention bonus pursuant to his Retention Agreement, a Results Based Incentive, stock options, tuition reimbursement, payment for time worked that was not made to him and expenses incurred that should have been reimbursed under his employment contract.

## Count I (Breach of Contract and Statute)

26. Mr. Weeks reasserts all of the preceding paragraphs as if fully set for herein.

27. Raytheon has violated M.G.L. Chapter 151 by virtue of failing to pay his earned retention bonus. Accordingly, he is entitled to attorney's fees and costs and any statutory penalties, including punitive damages under Massachusetts law. He also is entitled to those statutory compensatory and other damages for the contractual compensation and benefits that were improperly withheld under the Work Assignment Agreement.

28. There was no just cause to support Mr. Weeks' early termination such that he was denied the above-described compensation and benefits. Mr. Weeks performed his work consistent with expectations. His issuance of the letter to Mr. Nesbit was wholly within his employer's reasonable expectations. Mr. Weeks is entitled to the compensation and benefits that were denied him. He is entitled to his attorney's fees and costs.

### Count II (Breach of Implied Covenant of Good Faith and Fair Dealing)

29. Mr. Weeks reasserts all of the preceding paragraphs as if fully set for herein.

30. Raytheon was aware that they would be compelled to pay Mr. Weeks significant compensation and benefits if it did not find just cause to allow it to avoid its obligations. It intentionally, knowingly and improperly characterized his conduct as just cause when there was no cause to support termination. Accordingly, Raytheon breached the covenant of good faith and fair dealing. Mr. Weeks suffered compensable harm as a consequence of that misconduct.

### Count III (Order Compelling Arbitration and to Stay Court Proceedings)

31. Mr. Weeks reasserts all of the preceding paragraphs as if fully set for herein.

32. Since there was not just cause to support early termination of the Raytheon employment contracts, if the arbitration panel finds for Mr. Weeks in connection with the Retention Agreement, he is entitled apply the results of the arbitration as preclusive on the same questions fact and law in connection with his other employment agreement with Raytheon.

33. Mr. Weeks demanded arbitration from Raytheon in February 2022. He agreed to stay arbitration while the parties attempted to negotiate a resolution. Negotiations failed in April 2022 and Mr. Weeks demanded arbitration proceed. Raytheon to date has refused to respond to the demand for arbitration.

### Jury Demand

Plaintiff demands a jury trial on all the issues so triable.

Wherefore, Mr. Weeks demands the following relief:

a. An order compelling arbitration;
b. A stay on proceedings in this Court pending the outcome of arbitration;
c. Compensatory and punitive damages;
d. Attorney's fees and costs;
e. Prejudgment interest; and
f. All other relief the arbitrator finds just and equitable.

Dated at Burlington, Vermont this 24th day of June, 2022.

DAVID WEEKS

By: */s/ Sean M. Toohey*
Sean M. Toohey, Esq.
BBO#: 675583
Lynn, Lynn, Blackman & Manitsky, P.C.
*Attorney for Plaintiff*
76 St. Paul Street, Suite 400
Burlington, VT 05401
802-860-1500
stoohey@lynnlawvt.com